UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 28 2011 ★

BROOKLYN OFFICE

--------------------------------------------------------------x

CARMEN LOPEZ,

       Plaintiff,

-against-

MICHAEL J. ASTRUE, Commissioner of
Social Security

       Defendant.

--------------------------------------------------------------x

NOT FOR PUBLICATION
ORDER
09-CV-1678 (CBA)

AMON, Chief United States District Judge:

       Plaintiff Carmen Lopez, pro se, has petitioned for review of the Commissioner's denial of

Supplemental Security Income ("SSI") benefits. The Commissioner has moved for judgment on

the pleadings. For the reasons stated herein, the defendant's motion for judgment on the

pleadings is denied, and the case is remanded to the Social Security Administration for further

proceedings.


I.     **Background**

     A.    **Medical History**

          *1.    Medical Evidence Prior to October 28, 2005, the Plaintiff's SSI
             Application Date*

       Lopez was born in 1967 in Puerto Rico, and completed schooling up through the 10th

grade. (Tr. 459.) She has never worked because she was raising her five children. She

continues to live with her three school-age children and her boyfriend, and is supported by public

assistance.

       Lopez was a passenger in a motor vehicle accident on February 2, 2000. She was

transported to Brookdale University Hospital and Medical Center ("Brookdale Hospital") in an

ambulance and arrived complaining of pain to her right side and lower back. (Tr. 361.) An X-ray of her right shoulder was normal. (Tr. 366.) Lopez was prescribed Motrin and Toradol and discharged with a final diagnosis of strains to her right shoulder, and her lumbar and cervical spine. (Tr. 364.)

Lopez began treatment with Dr. John McGee, a licensed physician and doctor of osteopathic medicine, on February 7, 2000. She complained of headaches, dizziness, nausea, insomnia, and severe neck and back pain. (Tr. 396.) Examination of her spine revealed muscle spasm, positive Spurling's and straight leg raise tests, and reduced ranges of motion. Dr. McGee diagnosed post-concussion syndrome; vertigo/dizziness; and post- traumatic cervical, thoracic and lumbar sprain. The doctor referred Lopez for MRIs and other diagnostic studies, as well as physical therapy.

The MRIs of Lopez's spine, performed on February 23 and March 17, 2000, revealed cervical disc bulging at the C3-C4 through C5-C6 levels, and lumbar disc bulging at the L4-L5 levels. Electromyograms (EMG) and nerve conduction studies performed on March 3 and March 10, 2000 showed cervical and lumbar radiculopathy. Dr. McGee treated Lopez through October 2000, and his examinations continued to reveal limited range of motion in the lumbosacral spine, positive Spurling's tests, and positive straight leg raising tests. Lopez complained that the pain caused her sleep disturbances and interfered with her daily activities. (Tr. 385, 407-10, 428-40.)

Lopez saw chiropractor Gont Roman on March 28, 2000 for an initial evaluation. His examination of her cervical, thoracic and lumbar spine revealed muscle spasm, severe tenderness, and decreased ranges of motion. (Tr. 369.) Compression, distraction, apprehension, Dugas, straight leg raise, well leg raise, Dejerines, Yeomans and Kemps testing were all positive.

2

The initial impressions include spinal strain and radiculopathy. Lopez continued to attend chiropractic treatment and physical therapy until July 2000 when her no-fault insurance benefits ran out. (Tr. 387.)

On September 10, 2004, Lopez arrived at the Brookdale Hospital emergency room with complaints of a seizure. (Tr. 137-43.) She told hospital personnel that this was her first seizure episode. A neurology consultation report stated that Lopez complained of depression and sleep deprivation, and had not eaten in the preceding twenty-four hours. The neurologist opined that the seizure was most likely due to sleep deprivation and hypoglycemia, and that Dilantin (a seizure medication) was not needed in such a case. (Tr. 140.) Lopez was also referred for a psychiatric consultation, where she was diagnosed with adjustment disorder and depression, and was prescribed Zoloft. (Tr. 142.) She was discharged on September 13, 2004 with a final diagnosis of seizures and hypoglycemia.

Lopez again presented at the Brookdale emergency room on December 1, 2004 having suffered a seizure during her psychotherapy appointment while she was re-enacting an argument. (Tr. 134.) She was discharged in stable condition with a diagnosis of seizure disorder and depression. (Tr. 136.) Lopez underwent CT scans of her brain on February 25 and April 29, 2005 that were both negative. (Tr. 132-33.)

Lopez was seen by Dr. Andrew Merola at Downstate Medical Center on January 15, 2005 with complaints of significant back pain. Dr. Merola noted that an MRI showed a disc bulge at the L4-5 level. He diagnosed her with mechanical axial back and recommended pain management. (Tr. 371.)

Dr. McGee reevaluated the plaintiff's back condition on January 21, 2005. She complained of difficulty walking, standing, and bending, and stated that she couldn't carry her

3

groceries due to pain. Dr. McGee's examination of her spine revealed deep and superficial muscle spasm, muscle splinting, and reduced ranges of motion. (Tr. 373-75.) A Spurling's test was positive, which the doctor stated was indicative of cervical root impingement due to discogenic pathology. He diagnosed her with radiculopathy, cervical disc bulges, a herniated disc, and both spinal and shoulder strain. (Tr. 376.) His prognosis was that Lopez would continue to have permanent deformity that would cause restriction of motion and limitation in her daily activities.

Lopez was admitted to SUNY Downstate Medical Center by Dr. Ravi Yangala from May 9 to May 13, 2005 for continuous video-electroencephalogram (EEG) monitoring in order to characterize her seizure events. (Tr. 118-25, 288-356.) Lopez told Dr. Yangala that she believed her first seizure was in August 2004. She claimed that she passed out while on the phone, but did not seek any medical treatment at that time. (Tr. 118.) She stated that the next seizure was in September 2004, when she was taken to Brookdale Hospital and discharged four days later with a Dilantin prescription. She stated that she ran out of Dilantin in October 2004 and that month had a seizure in her therapist's office. She was again treated at Brookdale and discharged with Dilantin. She stopped taking her medication in February 2005 because it was making her drowsy, and that month, she passed out and was taken in an ambulance to Brookdale. (Tr. 119.) Lopez reported that her most recent seizure was two weeks before seeing Dr. Yangala. She passed out while walking on the street and was told that she was shaking for fifteen minutes. She was taken to Brookdale where she said she was sent home without any medications. (Tr. 119.)

4

Dr. Yangala noted that Lopez had a significant history of depression, including a hospitalization in 1999 for attempted suicide. (Tr. 119.) Lopez was seeing a psychiatrist at Brookdale and had been taking Zoloft until three months earlier.

The neurological examination conducted upon Lopez's admission to SUNY Downstate revealed normal results. (Tr. 120.) Lopez was alert and oriented, with normal short-term memory. She correctly performed a variety of cognitive tests, her speech was fluent, and she performed 3-step commands easily. The motor exam revealed normal strength and tone throughout. She demonstrated normal rapid alternating movements, fine finger movements, and finger-to-nose and heel-to-shin testing. She had normal stance and gait, and symmetric reflexes. (Tr. 120.)

Dr. Yangala reported that the video-EEG monitoring was normal, and revealed no focal or epileptiform abnormalities. (Tr. 120.) There were no seizure events during Lopez's four-day admission. Dr. Yangala opined that the testing results did not support a diagnosis of epilepsy, although she did not rule out the possibility of a deep epileptogenic focus with partial onset secondary generalized seizure. She also noted that non-epileptic events of a psychogenic nature were a possibility. Lopez was discharged with prescriptions for Zoloft and Trileptal, and Dr. Yangala recommended that she refrain from swimming without supervision or working at unprotected heights. She also recommended that Lopez refrain from driving until she had been seizure-free for one year.

Dr. Zina Turovsky, a physical medicine and rehabilitation specialist, examined Lopez on July 20, 2005. Her examination revealed painful restrictions on neck and low back movement and limited ranges of motion. (Tr. 449-50.) Dr. Turovsky diagnosed Lopez with spinal sprain and strain, intervertebral disc bulges, chronic neck and low back pain, and lumbosacral disc

5

herniation. (Tr. 450.) Dr. Turovsky opined that Lopez had permanent injury to her spine that caused limitations on range of motion and mobility. (Tr. 450-51.) Dr. McGee re-evaluated Lopez on August 5, 2005 and reported similar findings, along with positive Spurling's and straight leg raise testing. (Tr. 372.)

Lopez began attending therapy sessions with Yassi Gidfar, a psychology intern, at Brookdale Hospital Department of Psychiatry on September 16, 2005. The initial assessment report (tr. 105-16) indicates four suicide attempts prior to 2000. Lopez also claimed that she had a history of violence towards others, including four incidents in the past year. She complained of being "overwhelmed" by her children and having difficulty handling stress. A mental status exam revealed normal psychomotor activity and movements, an alert level of consciousness, coherent thought form and regular speech rhythm. (Tr. 108-09.) Ms. Gidfar diagnosed dysthymic disorder and recommended outpatient therapy. (Tr. 111.) She rated Lopez's global assessment of functioning (GAF) as 60.[1] (Tr. 110.) Lopez's psychotherapy sessions with Ms. Gidfar on September 21 and 28, 2005 focused on her relationship with her boyfriend and children. (Tr. 104.)

Near the end of her September 28 therapy session, Lopez had a seizure and was taken to the Brookdale emergency room. (Tr. 103, 126-28.) She told hospital personnel that she was taking Depakote, though the emergency department report questions her compliance. (Tr. 128.) She was diagnosed with seizure disorder and left the hospital before all her laboratory testing was completed. (Tr. 127.)

Ms. Gidfar's treatment plan for Lopez was approved by Dr. Raymond Pierre-Paul on October 17, 2005. (Tr. 246-49.) The diagnosis was bipolar disorder with mixed episodes. Ms.

---

[1] A GAF between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed., 2000).

Gidfar assessed that Lopez's strengths included getting along with others, travelling independently, maintaining impulse control and performing the activities of daily living. (Tr. 246.) Her weaknesses were that she had not worked before and did not have an adequate support system. Lopez missed her sessions with Ms. Gidfar on September 29 and on October 5, 13 and 26, 2005.

2.    *Medical Evidence After October 28, 2005, the Plaintiff's SSI Application Date*

On November 3, 2005, Dr. Raymond Paul-Pierre, a psychiatrist at the Brookdale Psychiatry Department, performed a mental status examination. He noted that Lopez was preoccupied with her children, responsibilities and health issues. (Tr. 230.) He reported poor impulse control, but fair memory and average intelligence, and no indication of delusions, hallucinations or compulsions. (Tr. 230-31.) He observed that she had impaired judgment and remained impulsive, aggressive and violent. He reported that she had gotten into a fight on the street that day. Dr. Pierre-Paul diagnosed bipolar disorder and assessed Lopez's GAF as 55. (Tr. 233.)

A prescription pad note dated November 11, 2005 indicates that a Dr. Jean Daniel Francois, a neurologist, diagnosed Lopez with seizure disorder, migraine, cervical disc disease and right shoulder strain. (Tr. 146.) The doctor ordered a check on her Depakote level, which was below the reference range. (Tr. 147.)

Lopez continued to participate in psychotherapy and medication management at Brookdale Department of Psychiatry through August 2007. (Tr. 98-104, 234-84.) Sessions focused frequently on her relationship with her boyfriend, children, and other family members, as well as on controlling her anger. She reported on December 16, 2005 that her medication was

7

helping her control her outbursts. (Tr. 100.) Lopez frequently failed to keep her appointments throughout this period. (Tr. 99-100, 283-84.) Her therapists repeatedly reported her noncompliance with both her seizure and antidepressant medications, and encouraged her to take her medication regularly. (E.g. tr. 240, 242, 248, 272.) Lopez claimed to have had a seizure around July 12, 2006 when she stopped taking her Depakote. (Tr. 272.)

Dr. Herbert Meadow, a psychiatrist, conducted a consultative examination on January 26, 2006. (Tr. 149-50.) He reported that Lopez arrived on public transportation by herself. She complained of depression due to her children and her unsafe neighborhood, as well as heightened levels of anxiety. Dr. Meadow noted that Lopez was hospitalized in 2000 when she had homicidal thoughts toward her then-boyfriend and his ex-girlfriend. Her mental status exam and sensorium and intellect exam produced normal findings other than a depressed and anxious mood. Lopez claimed that at home she did cooking and light housework. Dr. Meadow diagnosed dysthymia with generalized anxiety and panic attacks and opined that while Lopez did exhibit a psychiatric disorder, "it would not necessarily interfere with her ability to function in a low pressured setting." (Tr. 150.)

Also on January 26, 2006, Dr. A. Cacciarelli performed a consultative internal medicine examination. (Tr. 151-59.) Lopez claimed to have had a seizure the prior Monday and stated that she could not work because of her seizure disorder, for which she was on Depakote. (Tr. 151.) Dr. Cacciarelli's exam reported that Lopez had normal station and gait, full use of both hands and arms, negative straight leg raise test, and normal motor strength, sensation and deep tendon reflexes. (Tr. 151-52.) Dr. Cacciarelli diagnosed her with seizures and depression, and opined that she had "a limited ability to push, pull, carry heavy loads, and stand or walk for a long period of time." (Tr. 152.)

8

A general medical report was submitted on October 5, 2007 by Lopez's primary care physician, Dr. A. Moomiaie. (Tr. 185-94.) The doctor's diagnosis was depression, seizure disorder and gastritis. (Tr. 185.) The report did not contain any clinical or laboratory findings, and noted only that Lopez was taking Depakote, Zoloft, and Ambien. (Tr. 186.) Dr. Moomiaie also completed a medical source statement of Lopez's ability to perform work-related activities on October 17, 2007. (Tr. 188-93.) Dr. Moomiaie stated that Lopez could lift up to 20 pounds occasionally, carry up to 10 pounds occasionally, sit for up to three hours, stand for up to 30 minutes, and walk for up to one hour. He reported that Lopez could not perform activities like shopping or travelling without a companion for assistance, and that she could not sort or handle papers and files. (Tr. 193.) Dr. Moomiaie did not include any medical findings supporting his conclusions in the space provided.

Lopez underwent a consultative psychiatric evaluation with Michael Alexander, Ph.D. on October 9, 2007. (Tr. 180-83.) Dr. Alexander noted that Lopez had arrived on public transportation by herself. (Tr. 180.) Lopez reported anxiety and depression related to her children and neighborhood. Dr. Alexander found no evidence of panic or manic related symptoms, thought disorder, or cognitive deficit. He noted that Lopez's children did the cooking and cleaning, and that Lopez spent her day watching television, going to medical appointments and taking care of her children. (Tr. 182.) A mental status examination produced normal results, with adequate manner of relating and social skills. (Tr. 181.) Dr. Alexander opined that Lopez could follow directions, perform simple and complex tasks independently, and maintain a regular schedule. (Tr. 182.)

Dr. Jamshid Sheik performed a consultative internal medicine examination on November 6, 2007. (Tr. 204-08.) He concluded that no physical limitations were demonstrated. (Tr. 207.)

9

He stated that Lopez should have restrictions from operating heavy machinery and driving due to her seizure disorder.

## B.    Procedural History

Lopez filed an application for SSI benefits on October 28, 2005. Her Social Security Administration ("SSA") Disability Report alleged a disability due to epilepsy and bipolar disorder, with an onset date of November 1, 1999. (Tr. 57.) Her Function Report also reported back problems that interfered with her sleeping and her ability to perform daily activities. (Tr. 77-81.) The application was denied on May 1, 2006. (Tr. 38-41.) Lopez then filed a timely request for an administrative hearing, which was held in two parts—on October 25, 2007 and March 17, 2008. (Tr. 456-83.) Lopez was accompanied by a non-attorney representative. (Tr. 458.) Administrative Law Judge (ALJ) Lucian A. Vecchio, considered the case de novo and, on April 7, 2008, found that Lopez was not disabled within the meaning of the Social Security Act. (Tr. 10-21.) The Appeals Council denied the request for review of ALJ Vecchio's decision on July 23, 2008. (Tr. 4-6.) This action followed.

## II.    Standard of Review

The federal Supplemental Security Income program provides benefits to aged, blind, or disabled individuals who meet statutory income and resource criteria. 42 U.S.C. § 1381 et seq. SSI benefits are not payable prior to the month following the filing of the application. 42 U.S.C. § 1382(c)(7); 20 C.F.R. §§ 416.335. The Commissioner must consider, however, the medical record of at least the preceding twelve months, and any other earlier period necessary to the disability determination. 20 C.F.R. § 416.912(d).

"In reviewing the Commissioner's denial of benefits, the courts are to uphold the decision unless it is not supported by substantial evidence or is based on an error of law." Melville v. Apfel, 198 F.3d 45, 51-52 (2d Cir. 1999) (citing Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

In making this determination, the reviewing court is to defer to the ALJ's resolutions of conflicting evidence. See Clark v. Comm'r of Social Security, 143 F.3d 115, 118 (2d Cir. 1998) ("In reviewing the denial of SSI benefits, we must determine whether the SSA's decision was supported by substantial evidence and based on the proper legal standard, keeping in mind that it is up to the agency, and not this court, to weigh the conflicting evidence in the record."). Additionally, the reviewing court is not to engage in an independent analysis of the claim for benefits at issue. See Melville, 198 F.3d at 52 ("It is not the function of the reviewing court to decide de novo whether a claimant was disabled . . . or to answer in the first instance the inquiries posed by the five step analysis set out in the SSA regulations.").

Under the Social Security Act, "an individual shall be considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905. The Commissioner uses a five-step analysis to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 416.920. The Commissioner first determines whether the claimant is working; if she is engaging in substantial gainful activity, the claim will be denied

without consideration of any medical evidence. 20 C.F.R. § 416.920(a)(4)(i), 416.920(b). If the claimant is not working, the Commissioner determines whether the claimant has a severe impairment which significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c). If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment or combination of impairments that meets or equals one of the listings in Appendix 1 to 20 C.F.R. Part 404, Subpart P of the regulations; if so, the claimant will be found disabled with no further inquiry. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d). If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity ("RFC") to perform her past work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(e)-(f), 416.960(b). To determine the claimant's RFC, the Commissioner must consider all the claimant's impairments, not just those deemed severe. 20 C.F.R. §§ 416.920(e), 416.945; SSR 96-8p, 1996 WL 374184. If the claimant's RFC does not permit her to engage in her prior work, or if the claimant does not have any past relevant work, the fifth and final step requires the Commissioner to determine whether the claimant, in light of her RFC, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." Decker v. Harris, 647 F.2d 291, 298 (2d Cir. 1981); see 20 C.F.R. §§ 416.920(a) (4)(v), 416.920(g). If she cannot, benefits are awarded. Dixon v. Heckler, 785 F.2d 1102, 1103 (2d Cir. 1986). At the fifth step in the analysis, the burden falls on the Commissioner to establish that there is gainful work in the national economy that the claimant could perform. See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir.2004) (citing Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) and Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000)). With these standards in mind, the Court will now address the instant claim for benefits.

## III. Discussion

As Lopez has petitioned this Court pro se, her precise claims on appeal are difficult to discern. She continues to insist on the severity of her seizure disorder and back pain. She also appears to assert that the ALJ did not properly develop the record by compiling information from all her doctors. She also submits new evidence that she believes demonstrates her disability.

Were the plaintiff's mental health and seizure incidents the only conditions at issue, the Court may have found the ALJ's decision adequately reasoned and supported by substantial evidence. However, the record also contains a great deal of medical evidence regarding Lopez's back pain, which began following the car accident in 2000. The Court finds that the ALJ failed to articulate his manner of considering this evidence—particularly the reports submitted by a specialist treating source, Dr. McGee—in his five-step inquiry. Furthermore, Lopez has submitted new material evidence documenting her back injury that should be considered. For these reasons, remand in appropriate.

### A. The Plaintiff's Back Injury

The ALJ concluded at the second step of the analysis that Lopez's complaints of back pain did not constitute a severe impairment. He also gave little to no weight to Lopez's alleged back injury in his analysis of whether her condition(s) met a listed impairment, and in his evaluation of her RFC. First, the ALJ stressed that Lopez had not mentioned her back ailments when first applying for benefits in October of 2005. Second, he found the "record devoid of objective clinical findings" of back injury, and stated that "no examiner has even reported subjective findings of limitation of motion of the lumbosacral spine . . . [or] any observed abnormalities of gait or straight leg raising or any difficulties in moving about or sitting due to

13

back pain." (Tr. 16.) The ALJ thus concluded that while Lopez may have sustained back injuries in the 2000 motor vehicle accident, "the record since October 2005 . . . fails to document the presence of musculoskeletal pathology of the lumbosacral spine that would affect her ability to work." (Id.) The ALJ also stated that Lopez's claim of "receiving significant help in performing routine household chores or other activities of day-to-day functioning is not demonstrated in her progress notes with her therapist." (Tr. 18.)

It is worth noting that Lopez's initial Disability Report does not appear to have been filed out by her and contains only very cursory comments about her mental health. (Tr. 57-63.) In her self-completed Function Report, submitted on December 14, 2005, Lopez does expressly state that she has back problems (tr. 77), that her children do most of the housework because of her back pain (tr. 78), and that she has so much back pain that she sometimes cannot get out of bed (tr. 81). Thus, the SSA was indeed notified early in the application process that Lopez was complaining of significant back pain that was interfering with her daily life.

In concluding that the record provided no objective or subjective findings of back impairment, the ALJ appears to have given no consideration to the reports submitted by Dr. McGee, the physical medicine rehabilitation specialist who treated and evaluated Lopez for five months following the car accident in 2000, and reevaluated her in January and August of 2005. (Tr. 372-80.) The ALJ's opinion fails even to mention the documentation submitted by Dr. McGee, which includes extensive reporting from his treatment of Lopez in 2000, a detailed report from his January 2005 reevaluation, and a lengthy physician's affirmation that was submitted in February 2005 as part of a lawsuit that arose out of the car accident. (Tr. 381-91.) In failing to provide any analysis of Dr. McGee's reports, the ALJ appears to have given no

14

weight to the only treating source on record that performed extensive examinations and evaluations of the plaintiff's back condition.

The treating physician rule "mandates that the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); see also 20 C.F.R. § 404.1527(d)(2); Rodriguez v. Barnhart, No. 04 Civ. 949, 2004 WL 2997876, at *7 (S.D.N.Y. Dec. 28, 2004). If a treating source is not given controlling weight, "the Commissioner must give 'good reasons in his notice of determination or decision for the weight he gives [the claimant's] treating source's opinion.'" Botta v. Barnhart, 475 F. Supp. 2d 174, 187 (E.D.N.Y. 2007) (quoting Clark v. Comm'r of Social Security, 143 F.3d 115, 118 (2d Cir. 1998)). Failure to give good reasons is often a grounds for remand. Botta, 475 F. Supp. 2d at 187 (citing Schaal v. Apfel, 134 F.3d 496, 503-04 (2d Cir. 1998)); see also Rodriguez, 2004 WL 2997876 at *9 ("The failure to follow the procedure set forth in the regulations constitutes legal error and is grounds for a remand."). In determining the weight to be given to a treating source's opinion, the ALJ is directed to consider the "[l]ength of the treatment relationship and the frequency of examination; the [n]ature and extent of the treatment relationship; the relevant evidence . . . , particularly medical signs and laboratory findings, supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues." Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008); see 20 C.F.R. § 416.927(d).

In his August 2005 evaluation, Dr. McGee noted that Lopez was continuing to complain of pain of 6-8 on a scale of 10, and that the pain radiated to the upper and lower extremities. (Tr. 372.) In his objective findings, Dr. McGee reported muscle spasm, restrictions in motion, a

15

positive Spurling's test, and a positive straight leg raise test. (Id.) In his comprehensive exam on January 21, 2005, Dr. McGee documented range of motion tests with deficits ranging from 18% to 55 %. (Tr. 374.) He attributed these findings to "limited cervical joint motion and nerve injury" and muscle spasm. (Id.) Lopez had a positive Spurling's test "indicative of Cervical root impingement due to discogenic pathology." (Id.) Similarly, his examination of Lopez's lumbar spine reported deficits in ranges of motion between 38% and 50%. Dr. McGee cervical and lumbar strain syndrome, radiculopathy, cervical disc bulges at C34-56, and a lumbar herniated disc at L45.

Of particular relevance to this case, Dr. McGee wrote in his prognosis that he believed Lopez would continue to have "permanent deformity" with "permanent restriction of motion and permanent limitation of [the] activities of daily living" and "permanent recurrent pain." (Tr. 376.) He predicted poor recovery. (Tr. 376.) Moreover, Dr. McGee noted that both herniated and bulging discs are permanent injuries that do not resolve themselves. (Tr. 386-87.) He further explained that Lopez continued to demonstrate "objective evidence of injury" even five years after the accident, including muscle spasm and residual inflammatory pathology to the spine. (Tr. 390.) He found Lopez's description of her symptoms and the limitations on her daily life to be entirely consistent with his objective diagnoses, and predicted that they would only worsen with age. (Tr. 391.)

Dr. McGee's findings are corroborated by those of Dr. Turovsky, who examined the plaintiff on July 20, 3005. Dr. Turovsky also reported significant limitations in Lopez's range of motion in the lumbar and cervical regions, and painful restrictions of movement in the low back and neck. (Tr. 449.) She diagnosed disc bulges, chronic neck and low back pain due to spinal injury, and lumbosacral disc herniation. (Tr. 450.) Dr. Turovsky likewise concluded that

16

Lopez's injuries were permanent and were causing loss of range of motion and loss of mobility in her cervical and lumbosacral spine. (Id.) The ALJ likewise gave no consideration to these findings in his opinion.

In sum, the ALJ's assertion that the record was "devoid" of objective and subjective clinical findings related to limitation of motion or prohibitive back pain is contradicted by the considerable amount of evidence submitted by Dr. McGee, who provided extensive documentation indicating that Lopez's back injury was present in 2005 and likely to continue, if not worsen, for the rest of her life. Dr. Turovsky's reports are consistent with this prognosis. Given that Dr. McGee's reports are the only substantial documentation of Lopez's back injuries provided by a treating source, the ALJ should have explained if and how he was considering this evidence, and he should have given good reasons why he was not according any weight to Dr. McGee's opinions.

While the ALJ indicated that the absence of evidence post-dating Lopez's SSI application was fatal to her claim of severe back impairment (tr. 16), he offered no reasons for ignoring the prognoses of both Drs. McGee and Turovksy that her back injuries were permanent. Moreover, Dr. McGee's 2005 reports indicate that the only reason Lopez didn't continue to seek treatment for her back pain was because her insurance wouldn't cover it. If the ALJ felt that Dr. McGee's submissions were inadequate to determine whether Lopez had a continued disability, he had a "duty to seek additional information from [the doctor] sua sponte." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998); see Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."); see also 20 C.F.R. § 404.1512(d)-(e).

Indeed, there are some indications that the SSA did not adequately developed the record with respect Lopez's back injury prior to the ALJ's decision. See 20 C.F.R. § 416.912(d). Lopez made reference on her SSA Recent Medical Treatment form, completed in December 2006, to a neurologist named Dr. Francois who prescribed her medication for back pain. (Tr. 93-94.) There later appears a note written by Dr. Francois, dated November 11, 2005, that diagnoses her with cervical disc disease. (Tr. 146.) There are no other reports in the record from this doctor. The report submitted by Dr. Andrew Merola dated January 19, 2005 also indicates that he referred Lopez to a pain management physician for her back. (Tr. 371.) There are likewise no pain management documents appearing in the record. It thus appears that other treating sources with information on Lopez's continued back ailments for the relevant period may have been overlooked.

Additionally, Lopez stated during the hearing before the ALJ that she had newly developed problems with her spleen that were going to require an operation. (Tr. 468-69.) In her brief to this Court, Lopez argues that she has undergone a splenectomy that was also related to the car accident of 2000 and that continues to make her sick. Medical documentation related to her spleen was never compiled, and the ALJ appeared largely to ignore Lopez's statements about her spleen during the hearing. (Id.) Given the agency's particular duties to develop the record for pro se plaintiffs, the current gaps in information relating to Lopez's injuries should be addressed and, if possible, remedied. See Moron v. Astrue, 569 F.3d 108, 113 (2d Cir. 2009) ("When a claimant properly waives his right to counsel and proceeds pro se, the ALJ's duties [to develop the record] are 'heightened.").

Remand is thus appropriate to allow the ALJ to determine and articulate, in accordance with 20 C.F.R. § 416.927(d), the proper weight to be given to the records submitted by Dr.

McGee and any other records corroborating Dr. McGee's opinions. The ALJ should also develop the record as needed in order to adequately consider the plaintiff's back and spleen complaints.

## B.    New Evidence

A court reviewing the Commissioner's determination must generally base its decision "upon the pleadings and transcript of the record." 42 U.S.C. § 405(g); Mathews v. Weber, 423 U.S. 261, 263 (1976). However, a court may remand a matter to the Commissioner to consider additional evidence "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). "New evidence is considered material if (1) it is 'relevant to the claimant's condition during the time period for which benefits were denied,' (2) it is 'probative,' and (3) there is 'a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently.'" Williams v. Comm'r of Social Security, 236 F. App'x 641, 644 (2d Cir.2007) (quoting Pollard v. Halter, 377 F.3d 183, 193 (2d Cir.2004)); see also Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir.1988).

Lopez has submitted to this Court new documentation of her claimed disabilities. While some of the documents are of questionable utility, among the papers are the results of MRIs taken on her lumbar and cervical spine on March 30, 2011. The cervical spine report indicates disc bulges at C4-C5 and C6-C7, reversal of the cervical lordosis, multilevel desiccation change, and endplate and uncovertebral spurring. The impression states that "reversal of the cervical lordosis may be related to muscle spasm." The lumbar spine report finds "[d]egenerative change [in the] lumbar spine, most pronounced at L4-L5, where a disc bulge-spondylitic ridge with superimposed annular tear and 4 mm broad-based central disc herniation results in bilateral

neural foramen stenosis . . . with evidence of root impingement." Lopez also submits a brief form that appears to have been filled out by her pain management doctor, which diagnoses her with cervical and lumbar radiculopathy and states that she is "unable to work [the] next 6 months."

The Court finds that this new evidence meets the materiality requirements above. During the hearing before the ALJ, Dr. Richard Wagman, who offered expert medical testimony, specifically stated that he did not credit Lopez's continued complaints of serious back pain because there were no MRI results more recent than 2000. (Tr. 473.) Moreover, if the ALJ properly considered the reports submitted by Dr. McGee, these new MRI results could corroborate Dr. McGee's predictions that Lopez's impairments would last for a significant time, and could indicate that her impairments indeed did last through the pendency of her application for SSI benefits. See Pollard v. Halter, 337 F.3d 183, 193-94 (2d Cir. 2004) (noting that evidence generated after the ALJ's decision can be relevant to determining the severity and continuity of impairments during the relevant period); Lisa v. Secretary of Dep't of Health and Human Services, 940 F.2d 40, 44 (2d Cir.1991)( "[W]hen ... a diagnosis emerges after the close of administrative proceedings that sheds considerable new light on the seriousness of [the plaintiff's] condition, evidence of that diagnosis is material and justifies remand."). Given the ALJ's insistence on the lack of recent, objective documentation of back injury, this evidence has a reasonable possibility of affecting his analysis and the ultimate outcome of the case.

The Court also finds that Lopez has good cause for not presenting this evidence at the prior hearing. Good cause exists where "the evidence surfaces after [the Commissioner's] final decision and the claimant could not have obtained the evidence during the pendency of that proceeding." Lisa, 940 F.2d at 44; accord Mikol v. Barnhart, 554 F. Supp. 2d 498, 505

20

(S.D.N.Y. 2008). Here, the documents clearly indicate that these new MRI tests were not performed until after the ALJ's decision. As to an inability to produce them earlier, the record indicates that Lopez's financial resources and insurance coverage have restricted the amount of medical care she has been able to seek for her back injury. Obtaining more recent MRIs, as both the ALJ and Dr. Wagman claimed was necessary, would likely have been a difficult if not impossible task. In fact, given Dr. McGee's prognosis that Lopez's injuries were permanent and would not spontaneously resolve themselves, Lopez may have never been aware that more recent MRI results were necessary. Furthermore, the SSA regulations expressly state that "MRIs . . . are quite expensive, and we will not routinely purchase them." 20. C.F.R. Part 404, Subpart P, Appendix 1, at 1.00(C)(2). Thus, Lopez could not necessarily rely on the agency to determine that more recent tests were needed and to order them.

Finally, a court may properly consider the plaintiff's pro se status in its determination of good cause. See Jones v. Sullivan, 949 F.2d 57, 61 (2d Cir. 1991) (noting that the plaintiff's pro se status provided good cause for failure to present evidence earlier.) Here, Lopez appeared before the ALJ with only a non-attorney representative who hardly participated in the hearing and did not appear versant in the applicable law. (Tr. 476-78.) She has gone through the entirety of the application process without help of an attorney who could help her focus and substantiate her claims of disability. In light of the indications, noted above, that the agency may not have properly developed the record of her back injury, further consideration of her case is appropriate.

Accordingly, remand is also warranted in order to allow the ALJ to consider the new evidence submitted.

## CONCLUSION

For the reasons stated, pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Commissioner's decision is reversed and the plaintiff's claim is remanded for further administrative proceedings in accordance with this opinion. The defendant's motion for judgment on the pleadings is denied.

SO ORDERED.

Dated: Brooklyn, New York
November 2 , 2011

/Signed by Chief Judge Carol B. Amon/

Carol Bagley Amon
Chief United States District Judge